Manuel Martínez Díaz y otros, demandantes y recurridos, *v.* Estado Libre Asociado de Puerto Rico et al., demandados y peticionarios.

*Número:* CE-89-210        *Resuelto:* 11 de diciembre de 1992

*Rafael Ortiz Carrión, Procurador General,* y *Nilda P. Fuentes Ortiz, Procuradora General Auxiliar,* abogados del Estado Libre Asociado de Puerto Rico, peticionario; *José Denis Rodríguez Morales,* abogado de la Corporación Insular de Seguros; *Eduardo Castillo Blanco,* abogado de la Panadería Valoi; *Josué A. Rodríguez Rivera,* abogado del recurrido.

## SENTENCIA

Los hechos que dan lugar al caso de autos ocurrieron el 22 de mayo de 1986 en la Panadería Valoi situada en Río Piedras. En esa fecha y lugar, José De Jesús Muriel, policía estatal —fuera de servicio y vestido de civil— se percató de la presencia de un individuo que portaba un arma de fuego en el bolsillo del mameluco que vestía. Sin mediar palabra alguna, De Jesús Muriel lo encañonó por el costado derecho, lo desarmó y le disparó. El individuo —que posteriormente resultó ser Manuel Martínez Díaz— herido de bala en el abdomen y tendido en el suelo le indicó a su atacante De Jesús Muriel que él era policía y acto seguido se puso de pie y le mostró su tarjeta de identificación.

Posteriormente, fue llevado al Dispensario de Río Piedras junto a De Jesús Muriel. Allí le prestaron los primeros auxilios y luego lo trasladaron al Centro Médico de Río Piedras. Una vez allí, Martínez Díaz se enteró de que su atacante era miembro de la Policía de Puerto Rico.

El 23 de julio de 1986, Martínez Díaz prestó una *primera* declaración jurada sobre los hechos a la investigadora María Martínez Ortiz con el propósito de reclamar los beneficios del Fondo del Seguro del Estado. En esencia, declaró: (1) que no conocía a su agresor; (2) que a pesar de

estar fuera de servicio, se encontraba en funciones, puesto que la labor del policía se extiende a las veinticuatro (24) horas del día; (3) que la investigación del incidente estaba a cargo del "Agente José Hernández, Placa 4392 de la División de Homicidios, en el Cuartel General ..." (Apéndice al escrito de mostrar causa, pág. 33); (4) que el incidente constaba reportado en una querella de número 86-1-262-06341, y (5) que no se había celebrado "juicio" alguno con relación a este incidente en espera de que él se restableciera para poder someter el caso.

Tres (3) semanas después, el 14 de agosto de 1986, Martínez Díaz prestó una *segunda* declaración jurada sobre los hechos. Esta vez, a preguntas del Sgto. Justo Poventud Vidal —Oficial Investigador de la Superintendencia Auxiliar en Inspección y Asuntos Disciplinarios de la Policía— *declaró que se enteró* de *que su atacante De Jesús Muriel era miembro de la Policía cuando fue llevado al Centro Médico*. Además de las preguntas formuladas, surge que en siete (7) ocasiones el sargento Poventud Vidal le *hizo referencia y* le *mencionó específicamente a Martínez Díaz, el nombre de De Jesús Muriel como su atacante.*

Como parte de este proceso administrativo, el 22 de agosto de 1986 el Capitán Emilio Ramos Robles se comunicó con el Tnte. Cor. Policarpio Ruiz Ramos. Le informaba, entre otras cosas, que "[l]a entrevista realizada al guardia herido [entiéndase Martínez Díaz] revela[ba] una versión muy diferente a lo declarado por el guardia que ejecutó la acción [De Jesús Muriel]" (Apéndice al escrito de mostrar causa, pág. 38), evidenciando así, pues, la participación activa de Martínez Díaz en esta investigación. Este hecho también lo sostienen las alegaciones no contradichas presentadas por el codemandado José De Jesús Muriel en su *Moción de Desestimación de Demanda Enmendada* de 30 de septiembre de 1988.

El 29 de agosto de 1986 De Jesús Muriel fue denunciado en el Tribunal de Distrito, Sala de San Juan, por el delito de tentativa de asesinato. *Como víctima y testigo en este*

*procedimiento figuraba Martínez Díaz.* En ocasión de la investigación del caso, el 8 de septiembre de 1986 Martínez Díaz prestó una *tercera* declaración jurada ante la Fiscal Rosa Emilia Rodríguez, de la División de Investigaciones y Asuntos Criminales del Departamento de Justicia. En la declaración reiteró que *conoció* que su atacante *era policía el mismo día de los hechos mientras era atendido en el Centro Médico.*

Así las cosas, finalizada la investigación administrativa, el Superintendente de la Policía —mediante resolución de cargos fechada el 3 de diciembre de 1986— notificó a De Jesús Muriel su expulsión de la fuerza policíaca.

La investigación de estos hechos, realizada conjuntamente por la Policía de Puerto Rico y el Departamento de Justicia, fue una *exhaustiva* y *minuciosa*, según sostiene la propia parte demandante. "De este modo la prueba objetiva pudo obtenerse y *se pudo constatar la efectiva identidad de los testigos.*" (Énfasis suplido.) Apéndice al escrito de mostrar causa, pág. 13.

*Resulta incuestionable, pues, que por lo menos desde el 14 de agosto de 1986 Martínez Díaz tenía conocimiento tanto de la identidad de su agresor como de su nombre, al igual que de las circunstancias de su patrono.* No obstante, el 13 de abril de 1987 Martínez Díaz, su esposa Hilda Medina Ramos y la sociedad legal de gananciales compuesta por ellos presentaron una demanda por daños y perjuicios en el Tribunal Superior, Sala de San Juan, contra la "Panadería Valoi, *John Doe Empleado*[,] la Compañía X y Compañía Z, compañías aseguradoras". (Énfasis suplido.) Apéndice a petición de *certiorari*, pag. 13. Sorpresivamente no incluyeron como demandados a De Jesús Muriel ni al Estado, como tampoco le imputaron al primero la comisión de acto alguno, aun cuando hicieron referencia al agresor "codemandado" como "guardia de seguridad que trabajaba para la panadería ...". Apéndice al escrito de mostrar causa, pág. 1. Además, alegaron que "[s]e incluyen (sic) a

*John Doe* como aquella persona natural o jurídica que es o pudiera serle responsable en todo o en parte a los demandantes en este caso". (Énfasis suplido.) Íd., pág. 2.

El 19 de octubre de 1987 —transcurridos más de seis (6) meses desde la presentación de la demanda y aproximadamente a un (1) año y cinco (5) meses de acaecido el suceso— los demandantes Martínez Díaz *et al.* solicitaron la autorización del tribunal, y el 22 de octubre de 1987 enmendaron su demanda a los efectos de incluir como demandados a De Jesús Muriel y al Estado Libre Asociado. Imputaron actos específicos a De Jesús Muriel como agresor de Martínez Díaz, aduciendo que éste actuaba en funciones de su empleo con la "Policía de Puerto Rico y/o la Panadería Valoi" al momento del incidente, por lo que el Estado podía ser responsable.

Luego de varios trámites procesales, que incluyeron solicitudes de desestimación y de sentencia sumaria por parte del Estado —en las que alegaba la prescripción de la causa de acción en su contra— el 26 de octubre de 1988 el ilustrado foro de instancia resolvió que la demanda original *interrumpió el término prescriptivo* respecto a De Jesús Muriel, por cuanto se le había designado como un "demandado con nombre desconocido". Apéndice al escrito de mostrar causa, pág. 27. Arribó a esta conclusión *no obstante haber determinado que Martínez Díaz "conocía que su atacante era policía estatal desde la misma fecha de los hechos".* (Énfasis suplido.) Íd., pág. 26 esc. 1. Bajo ese supuesto, dictaminó que la acción contra el Estado no estaba prescrita y adujo que la responsabilidad vicaria de éste generaba una responsabilidad solidaria entre ambos y, por ende, la interrupción del término prescriptivo contra uno afectaba al otro.

Inconforme, el Estado acudió ante nos. El 3 de mayo de 1989 emitimos una resolución dirigida a la parte demandante para que mostrara causa por la cual no debíamos desestimar la acción contra el Estado por estar prescrita.

La parte demandante oportunamente compareció. Sus argumentos no nos persuaden. Entendemos que le asiste la razón al Estado Libre Asociado al sostener que la demanda está prescrita.

Por lo tanto, *se desestima la demanda contra ella y se revoca la resolución de 26 de octubre de 1988 del Tribunal Superior, Sala de San Juan.*

Lo pronunció y manda el Tribunal, y certifica el señor Secretario General. El Juez Asociado Señor Negrón García concurrió con opinión escrita, a la cual se unieron el Juez Presidente Señor Andréu García y el Juez Asociado Señor Rebollo López. La Juez Asociada Señora Naveira de Rodón disintió con opinión escrita. El Juez Asociado Señor Alonso Alonso disintió sin opinión escrita.

(*Fdo.*) Francisco R. Agrait Lladó
*Secretario General*

— O —

Opinión concurrente del Juez Asociado Señor Negrón García, a la cual se une el Juez Presidente Señor Andréu García y el Juez Asociado Señor Rebollo López.

"¿Es la verdad real la verdad judicial? ¿O la verdad real no logra trasparentarse en la verdad judicial?

Numerosísimos factores confluyen para que la verdad se escape al conocimiento originario del abogado y a la apreciación posterior del juez.

Cuando el abogado concierta los elementos necesarios para fundar su posición en el litigio y para armar las probanzas que le permitirán demostrar el acierto de tal posición, se encuentra con la enorme dificultad de desentrañar la verdad. La verdad se le brinda como agua que se desparrama. Muchas veces, ya de buena fe, ya de mala fe, son imprecisas, o reticentes, o desconfiadas, o inexactas,

las explicaciones de los interesados cuya defensa se asume. De manera que, ante todo, es menester aguzar la investigación para percibir la verdad en la dimensión con que debe acreditarla en el juicio, para que sus actuaciones respondan fielmente a esa verdad y así coincidan verdad judicial —lo probado en la litis— y verdad real —el acontecimiento humano—. ... Ansia vehemente de jueces y abogados es aunar ambas verdades. Sólo cuando se obtiene, cualquiera que sea la naturaleza del juicio, cabe decir que se ha hecho justicia, con el sentido supremo que el vocablo reviste." E. Díaz de Guijarro, *Abogados y Jueces*, Argentina, Ed. Abeledo-Perrot, 1959, págs. 30–31 y 34.

Para apreciar justamente este recurso, hemos de exponer el trasfondo fáctico y procesal atinente, según los autos originales del tribunal de instancia y los de este Foro.

## I

Conforme las alegaciones de la demanda original, la enmendada y demás documentos complementarios, su génesis se remonta a la noche del 22 de mayo de 1986 en la Panadería Valoi, situada en Río Piedras. En esa fecha y lugar, José De Jesús Muriel, policía estatal —fuera de servicio y vestido de civil— se percató de la presencia de un individuo que portaba un arma de fuego en el bolsillo del mameluco que vestía. Sin mediar palabra alguna, De Jesús Muriel lo encañonó por el costado derecho, lo desarmó y le disparó. El individuo —que posteriormente resultó ser Manuel Martínez Díaz—'herido de bala en el abdomen y tendido en el suelo le indicó a su atacante De Jesús Muriel que él era policía, y acto seguido se puso de pie y le mostró su carné de identificación. Posteriormente, fue llevado al Dispensario de Río Piedras junto a De Jesús Muriel. Allí le prestaron los primeros auxilios y lo trasladaron en ambulancia al Centro Médico de Río Piedras. Una vez allí, Mar-

tínez Díaz se enteró de que su atacante era miembro de la Policía de Puerto Rico.

Con el propósito de reclamar los beneficios del Fondo del Seguro del Estado, el 23 de julio de 1986 Martínez Díaz prestó una *primera* declaración jurada de lo sucedido ante la Investigadora María Martínez Ortiz. En esencia, declaró: (1) que no conocía a su agresor; (2) que a pesar de estar fuera de servicio, se encontraba en funciones, puesto que las funciones del policía se extienden a las veinticuatro (24 horas del día); 3) que la investigación del incidente estaba a cargo del "Agente José Hernández, Placa 4392 de la División de Homicidios en el Cuartel General ..." (Apéndice al escrito de mostrar causa, pág. 33); (4) que el incidente constaba reportado en una querella de número 86-1-262-06341, y (5) que no se había celebrado "juicio" alguno con relación a este incidente en espera de que él se restableciera para poder someter el caso.

Tres (3) semanas después, el 14 de agosto de 1986, Martínez Díaz prestó una *segunda* declaración jurada sobre los hechos. Esta vez, a preguntas del Sgto. Justo Poventud Vidal —Oficial Investigador de la Superintendencia Auxiliar en Inspección y Asuntos Disciplinarios de la Policía— *declaró que se enteró de que su atacante De Jesús Muriel era miembro de la Policía cuando fue llevado al Centro Médico.* Además de las preguntas formuladas, surge que en siete (7) ocasiones el sargento Poventud Vidal le *hizo referencia y* le *mencionó específicamente a Martínez Díaz, el nombre de De Jesús Muriel como su atacante.*

Como parte de este proceso administrativo, el 22 de agosto de 1986 el Capitán Emilio Ramos Robles se comunicó con el Tnte. Cor. Policarpio Ruiz Ramos. Memorando ASJ/12/76/665. Le informaba, entre otras cosas, que "[l]a entrevista realizada al guardia herido [entiéndase Martínez Díaz] revela una versión muy diferente a lo declarado por el guardia que ejecutó la acción [De Jesús Muriel]" (Apéndice al escrito de mostrar causa, pág. 38), eviden-

ciando así la participación activa de Martínez Díaz en esta investigación. Este hecho también lo sostienen las alegaciones no contradichas presentadas por el codemandado José De Jesús Muriel en su *Moción de Desestimación de Demanda Enmendada* de 30 de septiembre de 1988, pág. 3.

El 29 de agosto de 1986 De Jesús Muriel fue denunciado en el Tribunal de Distrito, Sala de San Juan, por el delito de tentativa de asesinato. *Como víctima y testigo en este procedimiento figuraba Martínez Díaz.* En ocasión de la investigación del caso, el 8 de septiembre de 1986 Martínez Díaz prestó una *tercera* declaración jurada ante la Fiscal Rosa Emilia Rodríguez, de la División de Investigaciones y Asuntos Criminales del Departamento de Justicia. Entre otros asertos, reiteró que *conoció* que su atacante *era policía el mismo día de los hechos mientras era atendido en el Centro Médico.*

Así las cosas, finalizada la investigación administrativa, el Superintendente de la Policía —mediante resolución de cargos fechada el 3 de diciembre de 1986— notificó a De Jesús Muriel su expulsión de la fuerza policíaca. Caso Núm. 0S-4-15-63.

Toda la investigación de estos hechos, realizada conjuntamente por la Policía de Puerto Rico y el Departamento de Justicia, fue *exhaustiva y minuciosa*, según sostiene la propia parte demandante. Véanse: Demanda enmendada de 22 de octubre de 1987, pág. 3; Moción en oposición a solicitud de desestimación de 25 de enero de 1988, págs. 3–4. "De este modo la prueba objetiva pudo obtenerse y *se pudo constatar la efectiva identidad de los testigos.*" (Énfasis suplido.) Apéndice al escrito de mostrar causa, pág. 13.

*Resulta incuestionable, pues, que por lo menos desde el 14 de agosto de 1986 Martínez Díaz tenía conocimiento tanto de la identidad de su agresor como de su nombre, al igual que de las circunstancias de su patrono.* No obstante, el 13 de abril de 1987 Martínez Díaz, su esposa Hilda Medina Ramos y la sociedad legal de gananciales compuesta

por ellos presentaron una demanda por daños y perjuicios en el Tribunal Superior, Sala de San Juan, contra la "Panadería Valoi, *John Doe Empleado*[,] la Compañía X y Compañía Z, compañías aseguradoras". (Énfasis suplido.) Apéndice a petición de *certiorari*, pág. 13. Sorpresivamente, no incluyeron como demandados a De Jesús Muriel ni al Estado, como tampoco le imputaron al primero la comisión de acto alguno, aun cuando hicieron referencia al agresor "co-demandado" como "guardia de seguridad que trabajaba para la panadería ...". Apéndice al escrito de mostrar causa, pág. 1. Además, alegaron que "[s]e incluyen (sic) a *John Doe* como aquella persona natural o jurídica que es o pudiera serle responsable en todo o en parte a los demandantes en este caso". (Énfasis suplido.) Íd., pág. 2.

El 19 de octubre de 1987 —transcurridos más de seis (6) meses desde la presentación de la demanda y aproximadamente a un (1) año y cinco (5) meses de acaecido el suceso— los demandantes Martínez Díaz *et al.* solicitaron la autorización del tribunal, y el 22 de octubre de 1987 enmendaron su demanda a los efectos de incluir como demandados a De Jesús Muriel y al Estado Libre Asociado. Imputaron actos específicos a De Jesús Muriel como agresor de Martínez Díaz, aduciendo que éste actuaba en funciones de su empleo con la "Policía de Puerto Rico y/o la Panadería Valoi" al momento del incidente, por lo que el Estado podía ser responsable.

Luego de varios trámites procesales, que incluyeron unas solicitudes de desestimación y de sentencia sumaria por parte del Estado —en las que alegaba la prescripción de la causa de acción en su contra— el 26 de octubre de 1988 el ilustrado foro de instancia (Hon. Pedro López Oliver, Juez) resolvió que la demanda original *interrumpió el término prescriptivo* respecto a De Jesús Muriel, por cuanto se le había designado como un "demandado con nombre desconocido". Apéndice al escrito de mostrar causa, pág. 27. Arribó a esta conclusión, *no obstante haber deter-*

*minado que Martínez Díaz "conocía que su atacante era policía estatal desde la misma fecha de los hechos".* (Énfasis suplido.) Íd., pág. 26 esc. 1. Bajo ese supuesto, dictaminó que la acción contra el Estado no estaba prescrita y adujo que la responsabilidad vicaria de éste generaba una responsabilidad solidaria entre ambos y, por ende, la interrupción del término prescriptivo contra uno afectaba al otro.

A solicitud del Estado acordamos. revisar. En esencia, cuestionan la inclusión de De Jesús Muriel como demandado a través de la figura del demandado de nombre desconocido y los efectos solidarios y la interrupción del término prescriptivo.

## II

Incidió el ilustrado foro de instancia. Bajo el esquema procesal y el trasfondo fáctico que emerge de los autos, no procedía la enmienda a la demanda e inclusión de De Jesús Muriel a través de la figura procesal del demandado de nombre desconocido, y como corolario, tampoco podía traerse válida y jurídicamente al Estado en forma alguna a este pleito. Expongamos los fundamentos que avalan esta ruta decisoria.

El término prescriptivo aplicable a las acciones por daños y perjuicios extracontractuales es de un (1) año. Art. 1868 del Código Civil, 31 L.P.R.A. sec. 5298. Este ha de contarse a partir del momento que el agraviado *conoce o debió razonablemente conocer* la existencia del daño y la identidad del agente que lo produjo. *Riley v. Rodríguez de Pacheco*, 119 D.P.R. 762 (1987). No es necesario conocer su nombre, bastando sólo el de su identidad.[1] Esta visión

---

[1] Mientras que la *identidad* se refiere al "[h]echo de ser una persona ... la misma que se supone o se busca", el *nombre* es el apelativo "que se da a persona ... para distinguirla de las demás de su especie o clase". *Diccionario de la Lengua*

resulta de la aplicación integral y armoniosa de la mencionada disposición sustantiva junto con las Reglas de Procedimiento Civil que permiten la presentación de demandas cuando el *reclamante diligente* conoce de su daño e identidad de su productor, más no su nombre. "Cuando un demandante ignore el verdadero nombre de un demandado, deberá hacer constar este hecho en la demanda, exponiendo la reclamación específica que alega tener contra dicho demandado. En tal caso, el demandante podrá designar a dicho demandado en cualquier alegación o procedimiento con un nombre ficticio y al descubrirse el verdadero nombre, hará con toda prontitud la enmienda correspondiente en la alegación o procedimiento." Regla 15.4 de Procedimiento Civil, 32 L.P.R.A. Ap. III.

Nuestra casuística reiteradamente informa que la Regla 15.4 de Procedimiento Civil, *supra,* tiene el propósito de moderar la brevedad de los términos prescriptivos ante el interés de la parte agraviada de vindicar sus derechos. *Núñez González v. Jiménez Miranda,* 122 D.P.R. 134 (1988). Véanse, también: J.E. Hogan, *California's Unique Doe Defendant Practice: A Fiction Stranger than Truth,* 30 Stanford L. Rev. 51 (1977), en el cual se discute la Sec. 474 del Código de Procedimiento Civil de California, modelo de nuestra Regla 15.4 de Procedimiento Civil, *supra*; *Fuentes v. Tribl. de Distrito,* 73 D.P.R. 959, 986 (1952). Sin embargo, su uso no es irrestricto. Como principio adjetival, no debe ser aplicado a situaciones en las que "no se trate meramente de ignorancia en cuanto al nombre de la parte demandada, conociéndose su identidad", la "ignorancia del verdadero nombre del demandado *debe ser real y legítima, y no falsa o espúrea*". (Énfasis suplido.) *Fuentes v. Tribl. de Distrito,* supra, págs. 985 y 986–987. Véase *Ortiz v. Gobierno Municipal de Ponce,* 94 D.P.R. 472, 478 (1967).

---

*Española,* 19na ed., Madrid, Ed. Espasa-Calpe, 1970, págs. 728 y 922.

El enfoque judicial de estricta observancia responde al mandato constitucional que no permite el menoscabo o modificación de derechos sustantivos por parte de las reglas procesales. Art. V, Sec. 6, Const. E.L.A., L.P.R.A., Tomo 1. Y ciertamente, la materia que regula la prescripción de acciones y derechos en Puerto Rico es de índole sustantiva y no procesal, siéndole aplicable este principio rector. *Febo Ortega v. Tribunal Superior*, 102 D.P.R. 405, 407 (1974); *Olmo v. Young & Rubicam of P.R., Inc.*, 110 D.P.R. 740, 742–743 (1981).

Bajo este marco conceptual, el término prescriptivo comienza a correr desde que el demandante conoce o debió, razonablemente, conocer su daño y la identidad de quien lo provocó. Desde ese instante puede interponer su causa de acción, eficiente y suficiente, en un tribunal, utilizando el recurso disponible en la Regla 15.4 de Procedimiento Civil, *supra*, de demandado de nombre desconocido.[2] Sólo así demostrará legítimamente su interés en ser reivindicado en sus derechos. Por supuesto, si conociendo, *o debiendo conocer*, el nombre del demandado, el demandante opta por no demandarlo e incluye en su demanda un demandado de nombre ficticio, no podrá ampararse en la Regla 15.4 de Procedimiento Civil, *supra*, para sustituir a este último por aquel cuya identidad y cuyo nombre conocía desde la interposición original de la demanda.

Como corolario, cuando se utiliza correctamente la figura del demandado de nombre desconocido, toda enmienda para lograr un cambio por el nombre recién conocido del demandado tendrá efectos retroactivos al momento de la interposición de la reclamación judicial ori-

---

[2] Así, pues, "el tiempo para la prescripción de toda clase de acciones, cuando no haya disposición especial que otra cosa determine, se contará *desde el día en que pudieron ejercitarse*". (Énfasis suplido.) J. Santos Briz, *La Responsabilidad Civil*, 4ta ed., Madrid, Ed. Montecorvo, 1986, págs. 983–984. Véase *Franco v. Mayagüez Building, Inc.*, 108 D.P.R. 192, 195 (1978).

ginal, aún expirado el término prescriptivo; de lo contrario, sólo tendrá efectos prospectivos. Regla 13.3 de Procedimiento Civil, 32 L.P.R.A. Ap. III.

Aclarados los horizontes sustantivos y procesales, apliquémoslos al caso de autos.

## III

Es claro que Martínez Díaz *conocía* la *identidad* y el *nombre* de su agresor *mucho antes* del 13 de abril de 1987, fecha de la presentación de la demanda original, por lo menos desde el 14 de agosto de 1986. Sus tres (3) declaraciones son prueba indisputable de que estaba al tanto de la *identidad*, como agente de la Policía, de De Jesús Muriel desde el *mismo día de los hechos*; y dos (2) de ellas demuestran que conocía su nombre exacto. Sabía, además, de la existencia de una querella donde constaba reportado el incidente en cuestión, y figuraba como *víctima y testigo* en la denuncia criminal presentada contra De Jesús Muriel.

Contrario a su contención de que "no recordaba y desconocía el nombre exacto de su agresor" (Escrito de mostrar causa, pág. 2), además de que su "capacidad emocional y de retención ... est[aba] menoscabada" (íd., pág. 8), las declaraciones juradas que prestara y sus actos muestran un discernimiento retentivo cabal y sumamente detallado. En la que prestó el 23 de julio de 1986, a escasos dos (2) meses de la alegada agresión, para reclamar beneficios del Fondo del Seguro del Estado, Martínez Díaz no sólo suministró el nombre del agente de la Policía que investigaba el incidente, sino que acertó a dar correctamente su número de placa y el de la querella del incidente. De igual forma, en las declaraciones juradas *posteriores* admitió que conoció que su agresor era miembro de la Policía de Puerto Rico cuando se encontraba en el Centro Médico el mismo día de los hechos. Su participación activa en los procedimientos

administrativos y criminales contra De Jesús Muriel —todos *anteriores* a la presentación de la demanda— es muestra *ulterior* del hecho de que la identidad y el nombre del agresor, junto con la de su patrono, eran conocidas.(³)

El conocimiento de Martínez Díaz es imputable a su esposa, la señora Medina Ramos y a la sociedad legal de gananciales. Independientemente de que, por razones obvias, ella debió conocerlo, tuvo ante sí suficientes recursos para descubrir con un mínimo de diligencia el nombre del agresor de su esposo. En último término, tanto ella como la sociedad legal de gananciales han de sufrir las consecuencias de esa falta de diligencia.

En resumen, ante la situación fáctica y procesal que antecede, es obvio que la acción —según presentada— contra De Jesús Muriel y el Estado está *prescrita*.

— O —

Opinión disidente emitida por la Juez Asociada Señora Naveira de Rodón.

Por las razones expresadas a continuación, disentimos de la sentencia que hoy emite este Tribunal.

---

(³) Aún asumiendo que Martínez Díaz no conocía "el nombre exacto" de su agresor para la fecha de la presentación de la demanda original —según alega en la declaración jurada que prestara el 11 de octubre de 1988 ante el notario público Luis Vizcarrondo Ortiz— procede la revocación de la resolución recurrida. El término prescriptivo para la presente acción comenzó a correr una vez *conocía o debía conocer* de las circunstancias del causante del daño. Nuestro sistema procesal se funda en el reclamante diligente. Así lo hemos requerido, específicamente, del demandante que pretende utilizar la figura del demandado de nombre desconocido. *Núñez González v. Jiménez Miranda*, 122 D.P.R. 134 (1988); *Fuentes v. Tribl. de Distrito*, 73 D.P.R. 959, 985–986 (1952).

Ciertamente, Martínez Díaz tuvo a su disposición recursos suficientes para poder averiguar, con un mínimo de esfuerzo, el nombre y las circunstancias de su agresor.

I

*Los hechos*

El 7 de abril de 1987, Manuel Martínez Díaz, su esposa Hilda Medina Ramos y la sociedad de bienes gananciales compuesta por ambos presentaron una demanda en la que reclamaban la cantidad de ciento treinta mil dólares ($130,000) en concepto de daños contra la Panadería Valoi, John Doe Empleado, la Compañía X y Compañía Z, compañías aseguradoras. Alegaron "[q]ue el día 22 de mayo de 1986, el demandante se personó al negocio conocido como Panadería Valoi, donde se disponía a comprar unos artículos, en ese momento el guardia de seguridad que trabajaba para la panadería co-demandada, lo presionó con un objeto por el costado derecho, acto seguido el referido co-demandado desarmó al demandante de su arma de reglamento, ya que el demandante es miembro de la Policía de Puerto Rico y al éste voltearse para ver qu[é] sucedía escuchó una fuerte detonación, cayendo al piso herido de bala en el abdomen." Alegaron, además, que como resultado de este incidente sufrieron los daños que reclaman.

Con respecto a John Doe Empleado, simplemente expresaron que se incluía "como aquella persona natural o jurídica que es o pudiera serle responsable en todo o en parte a los demandantes ...".

Así las cosas, en septiembre de 1987, transcurrido ya un (1) año y ocho (8) meses del incidente, los demandantes presentaron una moción en la que solicitaban la sustitución de parte y la expedición de nuevos emplazamientos. Alegaron específicamente que "el Estado Libre Asociado de Puerto Rico, a través de su instrumentalidad Policía de Puerto Rico y José De Jesús Muriel, en su carácter personal y como agente del Estado Libre Asociado de Puerto Rico, Policía de Puerto Rico" les podían ser responsables a los demandantes por los hechos alegados en la demanda.

Mediante moción aparte, solicitaron permiso para enmendar la demanda.

El 22 de octubre de 1987, el tribunal concedió lo solicitado y el 29 de noviembre los demandantes presentaron una demanda enmendada para sustituir a John Doe Empleado por el Estado Libre Asociado de Puerto Rico (en adelante Estado). En ésta, alegaron específicamente que la persona que entró a la Panadería Valoi e hirió al codemandante Martínez Díaz fue José de Jesús Muriel, miembro de la Policía de Puerto Rico; que éste actuaba en esos momentos en su carácter de agente de la Policía y/o de la Panadería Valoi, y "[q]ue la negligencia de dicho agente consistió en haber confundido al demandante con un asaltante, siendo dicha confusión el producto y consecuencia de la histeria, terror y acción impensada del agente, quien sin motivo y sin cerciorarse, procedió a disparar su arma contra el demandante". Le imputaron responsabilidad al Estado por las actuaciones del agente De Jesús Muriel.

El 7 de enero de 1988, el Estado presentó una moción de desestimación basada en insuficiencia del emplazamiento, falta de notificación al Estado y prescripción.[1] Esta moción la acompañó con una declaración jurada de una funcionaria del Departamento de Justicia en la cual ésta asevera que en dicho departamento no se recibió notificación alguna.

El 26 de octubre de 1988, el foro de instancia denegó las mociones del Estado y de De Jesús Muriel. En lo pertinente, resolvió que "la demanda original radicada interrumpió el término prescriptivo respecto al codemandado

---

[1] Junto a su petición de *certiorari*, el Estado Libre Asociado de Puerto Rico (en adelante Estado) acompañó copia de la carta del Superintendente de la Policía, fechada el 2 de marzo de 1987, al codemandante Martínez Díaz informándole de la expulsión del Cuerpo de la Policía de De Jesús Muriel. En esta carta, asevera además que Martínez Díaz compareció a la vista administrativa celebrada el 4 de febrero de 1990. Hemos examinado los autos originales y no aparece copia de esta carta como presentada al tribunal de instancia. No la podemos, pues, tomar en consideración.

José De Jesús Muriel, quien fue designado en dicha demanda como demandado con nombre desconocido, por lo que de haber actuado dicho codemandado, al momento de ocasionar los daños, como empleado del Estado Libre Asociado de Puerto Rico, o en ocasión de sus funciones como tal, el Estado sería solidariamente responsable con su empleado, lo que a su vez provocaría que la interrupción de la prescripción en cuanto al primero interrumpiera igualmente la prescripción respecto al Estado, como deudor solidario".(²)

El 25 de enero los demandantes presentaron su oposición y una moción en la cual solicitaban que se corrigiera el epígrafe de la demanda, para que se hicieran figurar como demandados en sustitución de John Doe Empleado, al "Estado Libre Asociado de Puerto Rico, Policía de Puerto Rico y José de Jesús Muriel, como agente de ésta y/o de la Panadería Valoi ...". El 4 de abril, el tribunal concedió la moción para enmendar el epígrafe y ordenó la expedición de los emplazamientos dirigidos al Estado y a De Jesús Muriel. El 17 de mayo se emplazó al Estado y el 27 de junio éste presentó un memorando de derecho en apoyo de su moción de desestimación. El 20 de agosto emplazaron a De Jesús Muriel.

Así las cosas, el 22 de agosto de 1988 la parte demandante presentó una moción para suplementar su oposición

---

(²) Con respecto a la alegación de falta de notificación al Estado, el tribunal expresó lo siguiente:

"Respecto a la solicitud de desestimación del Estado Libre Asociado basada en la falta de notificación dispuesta en el Art. 2A de la Ley Núm. 104 del 29 de junio de 1953, según enmendada, 32 L.P.R.A. sec. 3077, consideramos que la justa causa aducida por el demandante, no controvertida por la parte demandada, a los efectos de que tuvo que ser recluído en una institución hospitalaria para practicarle una operación de emergencia, lo que a su vez produjo que estuviera por más de seis meses incapacitado físicamente, y su creencia, hasta el 9 de septiembre de 1987, de que el codemandado José De Jesús Muriel era empleado a tiempo parcial de la panadería, son razones suficientes, a la luz de la jurisprudencia, para eximir al demandante de dicho requisito de notificación, sobre todo, si consideramos que el Estado inmediatamente luego de que ocurrieran los hechos realizó una investigación completa de lo sucedido, haciendo innecesaria la notificación del demandante a los fines que persigue dicho requisito de notificación." (Citas omitidas.)

a la desestimación, con la cual acompañó copias de la acusación por tentativa de asesinato presentada el 1ro de diciembre de 1986 contra De Jesús Muriel y de un memorando de fecha 22 de agosto de 1986 del capitán Ramos Robles al teniente coronel Ruiz Ramos sobre el incidente objeto de la demanda. En dicho informe específicamente se expresa que De Jesús Muriel, al ocurrir los hechos, "aparentemente trabajaba tiempo parcial en el referido establecimiento comercial [Panadería Valoi]".

El 27 de septiembre, el Estado se opuso a la moción de los demandantes y solicitó a su vez que se dictase una sentencia sumaria a su favor que desestimara la demanda. Acompañó en apoyo de esta solicitud una copia de una declaración jurada prestada el 14 de agosto de 1986 por el codemandante Manuel Martínez Díaz, ante el sargento Poventud Vidal, en relación con la investigación administrativa del incidente. En dicha declaración se expresa que el sargento le indicó a Martínez Díaz que se estaba investigando el incidente en que éste había resultado herido por el guardia De Jesús Muriel. También refleja la declaración que en seis (6) preguntas el sargento Vidal hizo mención del nombre del guardia De Jesús Muriel.(3)

---

(3) "Policía Martínez Díaz, soy el Sgto. Justo Poventud Vidal #8–5548, Oficial Investigador de la Superintendencia Auxiliar en Inspección y Asuntos Disciplinarios de la Policía de Puerto Rico.

"Estoy realizando investigación administrativa relacionada con incidente ocurrido el día 22 de mayo de 1986, a eso de las 9:40 P.M., en la Panadería Valoy, ubicada en la Calle Julio Andino, Urb. Villa Prades, en Río Piedras y donde resultó usted herido de bala por el Gdia. José A. De Jesús Muriel #2833, mientras se encontraba en el lugar.

"P– ¿En qué lugar de la panadería se encontraba el Gdia. José A. de Jesús Muriel cuando usted se personó al lugar?
"R– No había nadie en el lugar solamente el dependiente.

"P– ¿Se identificó el Gdia. De Jesús a usted como policía antes de hacer uso del arma de reglamento?
"R– En ningún momento.
"P– ¿Se encontraba uniformado el Gdia. De Jesús #2833 mientras se encontraba en la Panadería Valoy?

El 30 de septiembre de 1988, el codemandado De Jesús Muriel presentó una moción de desestimación acompañada de varios documentos en apoyo de sus contenciones: declaración jurada prestada por el codemandante Martínez Díaz ante el Fiscal Andrés Rodríguez Elías el 8 de septiembre de 1986; denuncia presentada por el agente José Hernández contra De Jesús Muriel, y carta de 3 de diciembre de 1986 del Superintendente de la Policía dirigida a De Jesús Muriel en la que se le notifica su expulsión del Cuerpo Policíaco por el incidente ocurrido en la Panadería Valoi. Cabe señalar que aunque en el epígrafe de la declaración jurada aparece el nombre del codemandado De Jesús Muriel, en la declaración de Martínez Díaz propiamente no se menciona a éste por su nombre. En todo momento el codemandante Martínez Díaz se refiere a su agresor como "esta persona".

El 18 de octubre de 1988, la parte demandante presentó una moción en oposición a la solicitud de sentencia sumaria del Estado acompañada de dos (2) declaraciones juradas del codemandante Martínez Díaz:[4] una prestada ante la agente investigadora María Martínez Ortiz el 26 de julio de 1986 y otra de 11 de octubre de 1988 prestada ante un notario. En ambas expresó que no conocía el nombre de la persona que le disparó. En la segunda añadió que estuvo "recibiendo tratamiento médico aproximadamente desde el 22 de mayo de 1986 al 9 de octubre de 1986"; que para la fecha en que presentó la demanda, el 13 de abril de 1987, aunque no conocía el nombre exacto de De Jesús Muriel, sí

---

"R– La persona que me hirió, no.

"P– ¿Conocía usted anteriormente al Gdia. José A. de Jesús #2833?

"R– No lo conozco.

"P– ¿Se identificó usted con el Gdia. De Jesús antes del disparo o después del disparo[?]

"R– Después del disparo le grité en voz alta 'soy policía' y luego le mostré mi identificación de policía.

. . . . . . . .

"P– ¿Le pregunto si ocurrió algún intercambio d[e p]alabras entre el Gdia. de Jesús y usted antes de ocurrir el disparo?

"R. No señor."

(4) También acompañó otra copia del memorando del capitán Ramos Robles de 22 de agosto de 1986.

lo podía identificar; que para esa fecha él entendía que De Jesús Muriel "trabajaba para la Panadería Valoi, a tiempo parcial, como guardia de seguridad, esto [le fue] informado por el Policía Tomás Mejías Lebrón, placa 8565, quien también trabajaba para dicha Panadería, a tiempo parcial, como guardia de seguridad", y que no fue hasta el 9 de septiembre de 1987 que se enteró que De Jesús Muriel, el día de los hechos, no estaba trabajando para dicho establecimiento.

El Estado solicitó la reconsideración en cuanto al planteamiento de prescripción y, el 30 de noviembre de 1988, el tribunal a quo la denegó reiterando su posición de que la interrupción en cuanto al Estado se daba por su carácter de deudor solidario con el agente De Jesús Muriel y no por haberse permitido la sustitución de John Doe Empleado por el Estado.

Inconforme, el Estado recurrió ante este Foro mediante recurso de *certiorari*. Planteó la comisión de tres (3) errores: (1) que el tribunal de instancia erró al aplicar la Regla 15.4 de Procedimiento Civil, 32 L.P.R.A. Ap. III, y concluir que la acción no estaba prescrita; (2) que erró al permitir la inclusión de nuevos demandados fuera del término prescriptivo sin cumplir con los requisitos de la Regla 13.3 de Procedimiento Civil, 32 L.P.R.A. Ap. III, y (3) que erró al resolver que el Estado era deudor solidario con su ex empleado José De Jesús Muriel.

El 3 de mayo de 1989 se ordenó a la parte demandante recurrida mostrar causa por la cual no se debía revocar la Resolución de 26 de octubre de 1988 y desestimar la acción contra el Estado por hallarse ésta prescrita.

II

*Sentencia sumaria*

Al amparo de la Regla 36.3 de Procedimiento Civil, 32 L.P.R.A. Ap. III, se podrá dictar una sentencia sumaria "si las alegaciones, disposiciones [deposiciones], contestacio-

nes a interrogatorios y admisiones ofrecidas, en unión a las declaraciones juradas, si las hubiere, demostraren *que no hay controversia real sustancial en cuanto a ningún [sic] hecho material* y que como cuestión de derecho debe dictarse ...". (Énfasis suplido.) Su propósito es aligerar la tramitación de un caso, permitiendo que se dicte sentencia sin necesidad de una vista en su fondo en los méritos, cuando se demuestra que no hay *controversia real sustancial sobre algún hecho material esencial.* Como regla general, la parte opositora podrá derrotarla presentando contradeclaraciones juradas y contradocumentos que pongan en controversia algún *hecho material esencial. Corp. Presiding Bishop CJC of LDS v. Purcell,* 117 D.P.R. 714 (1986); *Tello, Rivera v. Eastern Airlines*, 119 D.P.R. 83 (1987). Con relación a las declaraciones juradas que se sometan para apoyar u oponerse a una moción de sentencia sumaria, éstas deben contener hechos admisibles en evidencia y demostrar afirmativamente que el declarante está cualificado para declarar. Regla 36.5 de Procedimiento Civil, 32 L.P.R.A. Ap. III. "[D]eclaraciones juradas que contienen sólo conclusiones sin hechos específicos que las apoyen, no tienen valor probatorio, siendo, por lo tanto, insuficientes para demostrar la existencia de lo que allí se concluye." *Corp. Presiding Bishop CJC of LDS v. Purcell*, supra, pág. 722.

Ahora bien, para determinar la materialidad de algún hecho, hay que recurrir al derecho sustantivo. Sólo controversias genuinas sobre hechos que puedan afectar el resultado del caso pueden impedir el que se dicte sentencia sumaria. Pasemos ahora a discutir las cuestiones de derecho que reflejarán, con respecto al planteamiento de prescripción, la materialidad del hecho de si el codemandante Martínez Díaz conocía o no, para la fecha de la presentación de la demanda, el 13 de abril de 1987, el nombre de su agresor, el codemandado De Jesús Muriel.

## III

*La interacción entre la Regla 15.4 y la Regla 13.3 de Procedimiento Civil, y la figura de la prescripción*

Para determinar la materialidad de este hecho es necesario que discutamos la aplicación de las Reglas 15.4 y 13.3 de Procedimiento Civil, *supra*, a los hechos de este caso.[5] Anteriormente, en *Núñez González v. Jiménez Miranda*, 122 D.P.R. 134 (1988), tuvimos la oportunidad de examinar la figura del demandado de nombre desconocido de la Regla 15.4 de Procedimiento Civil, *supra*.[6] Allí indicamos que esta figura procesal vino precisamente "a suplir la necesidad de atemperar los efectos de los términos prescriptivos cuando, a pesar de la diligencia del reclamante y del hecho que éste conocía la identidad del deudor, no había podido obtener el nombre correcto para entablar en tiempo la demanda en su contra." *Núñez González v. Jiménez Mi-*

---

[5] Dichas reglas disponen lo siguiente:

*"13.3. Retroactividad de las enmiendas*

"Siempre que la reclamación o defensa expuesta en la alegación enmendada surgiere de la conducta, acto, omisión o evento expuesto en la alegación original, las enmiendas se retrotraerán a la fecha de la alegación original. Una enmienda para sustituir la parte contra la cual se reclama se retrotraerá a la fecha de la alegación original si, en adición a cumplirse con el requisito anterior, y dentro del término prescriptivo, la parte que se trae mediante enmienda (1) tuvo conocimiento de la causa de acción pendiente, de tal suerte que no resulta impedido de defenderse en los méritos, y (2) de no haber sido por un error en cuanto a la identidad del verdadero responsable, la acción se hubiera instituido originalmente en su contra."

*"15.4. Demandado de nombre desconocido*

"Cuando un demandante ignore el verdadero nombre de un demandado, deberá hacer constar este hecho en la demanda, exponiendo la reclamación específica que alega tener contra dicho demandado. En tal caso, el demandante podrá designar a dicho demandado en cualquier alegación o procedimiento con un nombre ficticio y al descubrirse el verdadero nombre, hará con toda prontitud la enmienda correspondiente en la alegación o procedimiento."

[6] Ya en *Sucn. Molinary v. Central Los Caños, Inc.*, 54 D.P.R. 847, 851 (1939), al analizar el Art. 141 del Código de Enjuiciamiento Civil, 32 L.P.R.A. ant. sec. 726, de donde proviene la actual Regla 15.4 de Procedimiento Civil, 32 L.P.R.A. Ap. III, distinguimos entre el caso de un demandado que es designado con un nombre ficticio por no conocerse el suyo y que luego se sustituye el nombre verdadero por el ficticio, y aquel en que se demanda a una persona por otra y más tarde se intenta traer a la otra al pleito. La Regla 15.4 de Procedimiento Civil, *supra*, versa sobre el primero de estos supuestos.

*randa*, supra, págs. 139–140. También expresamos que "para que la decisión del tribunal surta efecto contra la persona así designada, ésta tiene que ser traída al pleito con su nombre correcto [y debidamente notificada] con tiempo suficiente para que pueda defenderse de la reclamación". *Núñez González v. Jiménez Miranda*, supra, pág. 141.

Es norma procesal firmemente establecida en nuestra jurisdicción que, "a los fines de la prescripción, la fecha en que se demande a un demandado se establece inexorablemente por la fecha en que se le incluye por primera vez como demandado". *Bithorn v. Santana*, 68 D.P.R. 300, 305 (1948). Véanse: *Márquez v. Tribl. Superior*, 85 D.P.R. 559, 561 (1962); *Ortiz v. Gobierno Municipal de Ponce*, 94 D.P.R. 472, 476 (1967); *Figueroa Díaz v. Escobales*, 101 D.P.R. 173, 175 (1973). Ahora bien, el determinar cuándo ha sido incluida por primera vez en una demanda una persona en los casos en que se utiliza el mecanismo procesal del demandado de nombre desconocido, precisa un análisis de la interacción de las Reglas 15.4 y 13.3 de Procedimiento Civil, *supra*. La primera de éstas procede del Art. 141 del Código de Enjuiciamiento Civil, 32 L.P.R.A. ant. sec. 726, y la segunda de la Regla 15(c) de Procedimiento Civil federal.

La Regla 13.3 de Procedimiento Civil, *supra*, se utiliza cuando por error, en cuanto a la identidad del verdadero responsable, se incluye como demandada a otra persona. *Vda. de Rivera v. Pueblo Supermarkets*, 102 D.P.R. 134 (1974); J.A. Cuevas Segarra, *Práctica Procesal Puertorriqueña: Procedimiento Civil*, San Juan, Pubs. J.T.S., 1979, Vol. II, Cap. III, pág. 29. De otra parte, la Regla 15.4 de Procedimiento Civil, *supra*, está disponible cuando el demandante conoce la identidad de la persona que se hace responsable, pero desconoce su verdadero nombre.

Al utilizar la Regla 13.3 de Procedimiento Civil, *supra*, se está sustituyendo a la persona que ha sido incluida en la

demanda por error, por la verdaderamente responsable. Esta última, por primera vez, adviene a ser parte en el pleito al presentarse la demanda enmendada. En relación con la Regla 15.4 de Procedimiento Civil, *supra*, sin embargo, siempre se intentó demandar a la persona que originalmente se incluyó con nombre ficticio. Por lo tanto, con la demanda enmendada no se incluye un nuevo demandado, meramente se sustituye el nombre ficticio con que aparece en la demanda el demandado, por el verdadero nombre. A este demandado "se le considera como una parte en el pleito desde la interposición de la demanda original, y es ésa la fecha a considerar para determinar cualquier planteamiento sobre prescripción extintiva". *Ortiz v. Gobierno Municipal de Ponce*, supra, pág. 478. Véase *Núñez González v. Jiménez Miranda*, supra.

En el caso de autos, los demandantes no hicieron una alegación específica de que se estaba demandando a John Doe Empleado por desconocer su verdadero nombre y que, cuando se descubriese éste, se haría la enmienda correspondiente. Ahora bien, el propósito de las alegaciones es hacer "una relación sucinta y sencilla de la reclamación demostrativa de que el peticionario tiene derecho a un remedio". Su función es la de simplemente bosquejar la controversia para que las partes queden notificadas de la naturaleza general de las contenciones en su contra. *Moa v. E.L.A.*, 100 D.P.R. 573, 586 (1972). Estas alegaciones deben ser interpretadas liberalmente, de forma tal que se haga justicia sustancial —Reglas 6.2 y 6.6 de Procedimiento Civil, 32 L.P.R.A. Ap. III; R. Hernández Colón, *Manual de Derecho Procesal Civil*, 2da ed. rev., New Hampshire, Ed. Equity, Parte 7, Cap. 21, Secs. 2101–2104, págs. 163–166; *5 Wright and Miller, Federal Practice and Procedure: Civil 2d* Sec. 1202, Cap. 4 (1990)— teniendo siempre presente que las reglas procesales tienen como propósito el hacer viable la consecución de los derechos sustantivos. Regla 1 de Procedimiento Civil, 32 L.P.R.A. Ap. III; *Dávila*

*v. Hosp. San Miguel, Inc.*, 117 D.P.R. 807, 816 (1986); *Moa v. E.L.A.*, supra. Tomando estas normas procesales en consideración y leyendo la demanda original de forma integral —el epígrafe, las alegaciones y la súplica conjuntamente— concluimos que la intención del demandante fue demandar con un nombre ficticio al agente De Jesús Muriel. Resulta, pues, de suma importancia para determinar si tenían o no los demandantes disponible el mecanismo procesal antes discutido, el hecho de que el codemandante Martínez Díaz no conociera, al momento de presentar la demanda, el verdadero nombre de dicho agente.

En el caso de autos, por tratarse de una demanda en la cual se incluyó al codemandado De Jesús Muriel con un nombre ficticio por supuestamente desconocerse, al momento de presentar la demanda, su verdadero nombre, sería, pues, de aplicación la Regla 15.4 de Procedimiento Civil, *supra*. Si se determinase que no se conocía su verdadero nombre al presentar la demanda, habría que concluir que formó parte de la demanda original, aunque allí apareciera designado con un nombre ficticio.

Dentro del contexto de esta reclamación y en relación con la defensa de prescripción del Estado, la inclusión o no del codemandado De Jesús Muriel en la demanda original resulta un hecho importante, sólo en tanto y en cuanto se pueda responsabilizar solidariamente al Estado por las actuaciones de éste. Pasemos, pues, a considerar y analizar este aspecto del problema.

## IV

*La responsabilidad del Estado por las actuaciones de sus funcionarios, agentes y empleados, y la solidaridad*

El Estado como persona jurídica no puede actuar de una manera directa e inmediata; tiene que hacerlo por mediación de personas físicas que ejerzan las funciones estatales

en su nombre, o sea, de los funcionarios públicos en todos sus grados y categorías.

> Si es necesario para la vida del Estado la existencia de unos funcionarios públicos que en su nombre actúen y estén revestidos de poder y autoridad, los perjuicios de ellos derivados, no es justo que los soporten un reducido número de personas, sino que es exigencia de la equidad que estén repartidos entre todos los ciudadanos; ya que son todos ellos los que obtienen las ventajas de la existencia y funcionamiento del Estado. ...
> Si se exime al Estado de responsabilidad por los actos realizados por los funcionarios públicos, la garantía que da la intervención del Estado, en muchos casos, desaparece completamente. Y cada uno tendrá que averiguar la solvencia del funcionario para relacionarse con el Estado, con lo que se consigue una disminución del prestigio y de la importancia que precisamente se trata de obtener.[7] A. Borrell Macía, *Responsabilidades derivadas de culpa extracontractual civil*, Barcelona, Ed. Bosh, 1942, Cap. X, Sec. 58, págs. 137–138,

En Puerto Rico, en relación con los daños causados por las actuaciones del Estado a través de sus funcionarios, agentes y empleados, hemos adoptado una fórmula mixta que permite en forma general, pero con ciertas exclusiones específicas, que se demande al Estado.

La ley conocida como Ley de Reclamaciones y Demandas Contra el Estado, Ley Núm. 104 de 29 de junio de 1955, según enmendada, 32 L.P.R.A. secs. 3077–3092a, es la que regula las reclamaciones judiciales contra el Estado.[8] Esta ley está "inspirada en el deseo de que el Estado pueda ser demandado cuando cualquier ciudadano entienda que tiene una buena y justa causa de acción y que sea el poder judicial el que determine la validez y suficiencias [sic] que se formulan contra el Estado". Informe de la

---

[7] Argumentos en favor de responsabilizar al Estado por las actuaciones de sus funcionarios.

[8] Para un recuento histórico sobre el desarrollo de la doctrina de inmunidad soberana y un contraste entre el concepto civilista y el del derecho común, véase la opinión disidente en parte y concurrente en parte del Juez Asociado Señor Rigau en *Galarza Soto v. E.L.A.*, 109 D.P.R. 179 (1979).

Comisión de lo Jurídico de la Cámara de Representantes, 4 Diario de Sesiones 1989.

La Ley Núm. 104, *supra*, enmendó también el Art. 1803 del Código Civil, 31 L.P.R.A. sec. 5142, de forma tal que quedara eliminada de éste la distinción que se hacía entre los actos realizados por un agente especial y los realizados por funcionarios, agentes o empleados a quienes propiamente correspondía la gestión practicada. Dispuso que el Estado sería responsable en las mismas circunstancias y condiciones que un ciudadano particular. Antes de la enmienda, el Estado sólo respondía si el daño había sido causado por un agente especial, no cuando había sido causado por el funcionario a quien propiamente correspondía la gestión practicada, en cuyo caso, sólo respondía el funcionario en cuestión a base del Art. 1802 del Código Civil, *supra*. En otras palabras, con anterioridad a la Ley Núm. 104, *supra*, el funcionario era el que respondía por los daños que ocasionaba. *Rivera v. Pueblo*, 65 D.P.R. 983 (1946). El propósito y la intención de la Ley Núm. 104, *supra*, es, pues, el beneficiar tanto al ciudadano perjudicado como al funcionario.

Sin embargo, y a pesar de que la intención de la ley es que el Estado responda por los actos y omisiones de los funcionarios y agentes especiales "en las mismas circunstancias y condiciones en que sería responsable un ciudadano particular" (Art. 1803 del Código Civil, *supra*) —siempre y cuando cumpla con las condiciones que impone la ley— el Art. 6 de la Ley Núm. 104, *supra*, 32 L.P.R.A. sec. 3081, excluyó ciertas actuaciones de los funcionarios de la autorización de demandas al Estado. El inciso (d) de dicho artículo, 32 L.P.R.A. sec. 3081(d), específicamente dispone que el Estado no autoriza ser demandado por los daños ocasionados por actos de un funcionario, agente o empleado constitutivos de acometimiento, agresión u otro delito contra la persona. Estas exclusiones a la renuncia de la inmunidad soberana del Estado, por ser limitaciones al

derecho de un ciudadano perjudicado a obtener reparación por los daños sufridos como consecuencia de actuaciones del Estado a través de sus funcionarios, agentes o empleados, las hemos interpretado de forma restrictiva. En *Báez Vega v. E.L.A.*, 87 D.P.R. 67, 73 (1963), resolvimos que bajo el inciso (d) del Art. 6, *supra*, se entendía que el Estado había renunciado a su inmunidad cuando los daños provenían "[d]e actos negligentes de un empleado que no constituyan determinados delitos en que la intención es un elemento esencial". Véanse, también: *Montes v. Fondo del Seguro del Estado*, 87 D.P.R. 199, 205–208 (1963); *Rivera Rivera v. Trinidad*, 100 D.P.R. 776 (1972). Por lo tanto, "[l]a inmunidad del Estado contra reclamaciones por daños se ha reducido a aquellas originadas en actos criminosos cometidos intencional o deliberadamente por sus funcionarios, agentes o empleados". *Rivera de Vincenti v. E.L.A.*, 108 D.P.R. 64, 71 (1978).

Siguiendo esta trayectoria de interpretación liberal con relación a la autorización a los ciudadanos para presentar reclamaciones contra el Estado por actuaciones de funcionarios, agentes o empleados, en *Alberio Quiñones v. E.L.A.*, 90 D.P.R. 812, 816 (1964), expresamos que bajo "el estado actual de nuestra Ley y nuestra jurisprudencia [no] se puede hacer una válida distinción entre la responsabilidad de una persona particular y el Estado cuando se trata de un daño causado por negligencia ...". Claro, esto deberá entenderse dentro de las limitaciones y exclusiones de responsabilidad del Estado establecidas por la Ley Núm. 104, *supra*.

El Art. 8 de la Ley Núm. 104, *supra*, 32 L.P.R.A. sec. 3083, a su vez, dispone que cualquier acción allí autorizada "impedirá toda otra acción por parte del reclamante, por razón de la misma cuestión o materia, contra el funcionario, agente o empleado cuyo acto u omisión dio origen a la acción; y la sentencia contra el funcionario, agente o empleado impedirá igualmente toda acción contra el Estado".

La ley, pues, le otorga al reclamante la opción de "recobrar directamente del empleado o recobrar del Estado, pero no puede recobrar simultáneamente de ambos". *Vázquez Negrón v. E.L.A.*, 113 D.P.R. 148, 151 (1982).

Cabe señalar que a pesar de la diferencia en enfoque entre nuestra Ley de Reclamaciones y Demandas Contra el Estado y la ley federal que le sirvió de patrón, Ley Federal de Reclamaciones de Daños (*Federal Torts Claims Act*, 28 U.S.C. secs. 1346(b) y 2679(b)), dejamos como *quaere* en *Vázquez Negrón v. E.L.A.*, supra, pág. 15 esc. 3, si tomando esto en consideración y a tenor con las Reglas de Procedimiento Civil, el Estado y el empleado podían acumularse como demandados en el mismo pleito.

Bajo el estatuto federal no se pueden acumular en el mismo pleito al Gobierno federal y al empleado. Esto es así, ya que el Gobierno asume toda la responsabilidad por sus empleados, estableciendo como único y exclusivo remedio del perjudicado —si el empleado se encontraba en gestiones de su empleo— la demanda contra el Gobierno de los Estados Unidos en la Corte Federal. 28 U.S.C. secs. 1346(b); *Vda. de Gerena v. U.S.D.A.*, 105 D.P.R. 309, 313 (1976). Al amparo de nuestra Ley de Reclamaciones y Demandas Contra el Estado, contrario a la ley federal, el Estado, en aquellos casos en que permite que se le demande, no asume exclusivamente la responsabilidad por las actuaciones de sus empleados que produjeron el daño. La ley permite que se demande y obtenga sentencia contra cualesquiera de los dos. Lo que prohíbe es "la acción directa contra el agente o empleado público una vez se dicte sentencia contra el Estado y viceversa". *Vázquez Negrón v. E.L.A.*, supra, pág. 151.

Ahora bien, la Regla 16.2 de Procedimiento Civil, 32 L.P.R.A. Ap. III, permite la acumulación de aquellas personas que, a pesar de no ser partes indispensables, deben ser acumuladas si se ha de conceder un remedio completo a las

personas que ya son partes en el pleito.(⁹) En el caso de una reclamación contra el Estado al amparo de la Ley Núm. 104, *supra*, resulta particularmente aconsejable que se permita la acumulación del Estado y el empleado. Si por alguna razón se determina que el Estado no responde,(¹⁰) la acción contra el empleado por su conducta culposa puede continuar, evitando así la duplicidad de esfuerzos procesales, la mala utilización de recursos y la posibilidad de determinaciones de hechos contradictorias en casos independientes sobre un mismo incidente. Entendemos, pues, que en una demanda contra el Estado al amparo de la Ley Núm. 104, *supra*, se pueden acumular como demandados en el mismo pleito al Estado y al empleado causante del daño.(¹¹)

Tomando en consideración estas normas estatutarias y jurisprudenciales, pasemos ahora a determinar si el Estado, además de responder directamente por las actuaciones de sus funcionarios, agentes o empleados, Art. 1803 del Código Civil, *supra*, responde también de forma solidaria.

El Art. 1803 del Código Civil, *supra*, establece una doble y coincidente respuesta indemnizatoria que persigue el fin de lograr que la víctima que sufre el daño sea resarcida, y cuyo fundamento es la culpa *in vigilando* o *in eligendo* en que incurren las personas allí enumeradas. Frente al perjudicado o afectado del siniestro, responden directamente las personas enumeradas en dicho artículo, al igual que el agente causante material. La víctima puede optar por de-

---

(⁹) Véase *Granados v. Rodríguez Estrada II*, 124 D.P.R. 593 (1989).

(¹⁰) Ejemplos de esto podrían ser el que prosperasen, entre otras, las siguientes defensas: falta de notificación, que el alegado acto culposo se encuentra dentro de una de las exclusiones, o que se emplazó incorrectamente al Estado.

(¹¹) Una vez el tribunal autorizó la sustitución del nombre verdadero por el ficticio que aparecía en la demanda original y en la presentación de la demanda enmendada, los demandantes podían optar por incluir en ella sólo al agente De Jesús Muriel o al Estado, como demandado o a ambos. Debido al estado incierto de la jurisprudencia en ese momento, en cuanto a si se podían o no acumular al Estado y al funcionario como partes en el mismo pleito, no es de extrañarse que los demandantes optaran por incluir sólo al Estado en la demanda enmendada.

mandar a ambos o a uno solo de ellos, ya que ambos vienen obligados a satisfacer *in integrum* su pretensión reparatoria. En conformidad con la expresión literal y el espíritu que informa el Art. 1803 del Código Civil, *supra*, la obligación reparatoria de las personas enumeradas es, pues, directa y no subsidiaria.

Soto Nieto y Santos Briz comentan en relación con el Art. 1903 del Código Civil español, de donde proviene nuestro Art. 1803, *supra*, "que la tendencia jurisprudencial actual [en España] se encamina a la estimación solidaria de la responsabilidad de los distintos deudores, pese la independencia de origen que puedan acusar las mismas". F. Soto Nieto, *Responsabilidad civil derivada del ilícito culposo*, Madrid, Ed. Montecorvo, 1982, Cap. V, Sec. III, pág. 195; J. Santos Briz, *La Responsabilidad Civil*, Madrid, Ed. Montecorvo, 1981, 2da parte, Cap. XII, Secs. II–V.

En la mayoría de los códigos civiles extranjeros la doctrina jurídica sobre la solidaridad de responsables de un acto ilícito se encuentra expresamente regulada, proveyendo la responsabilidad solidaria frente al perjudicado.([12]) El Código suizo, por ejemplo, al igual que la tendencia jurisprudencial española, dispone que se responderá solidariamente frente al damnificado cuando varias personas, aunque por distintos fundamentos —por acto ilícito, contrato o por leyes— respondan del mismo daño. Santos Briz, *op. cit.*, págs. 425–426.

En relación con la responsabilidad solidaria que emana del Art. 1903 español por hecho ajeno, Soto Nieto nos dice:

Si las respectivas responsabilidades de agente material y res-

---

([12]) Excepción notoria a esta doctrina es la adoptada en la jurisdicción francesa, responsabilidad *in solidum*. H.H. Brau, *El término prescriptivo y su interrupción en acciones en daños por responsabilidad extracontractual solidaria en el Derecho puertorriqueño*, 44 Rev. C. Abo. P.R. 203 (1983). Sobre la doctrina de la responsabilidad *in solidum*, véase, también, A. de Cossío, *Instituciones de Derecho Civil*, Madrid, Ed. Alianza, 1975, Vol. I, págs. 309–310.

ponsable por hecho de otro son directas, si el perjudicado puede encauzar su acción simultáneamente contra uno y otro para hacer satisfacer *in integrum* su pretensión reparatoria, secuela de ello será la ligazón solidaria de ambos responsables en su respuesta obligacional. Así lo entiende, igualmente, la Jurisprudencia, precisando que si bien es cierto que la solidaridad, al no presumirse, debe expresamente establecerse, hay casos en que la impone el legislador en atención a ciertos intereses que quiere tutelar, cual es la decretada como sanción de una falta para que el perjudicado tenga la garantía de poder dirigirse indistintamente contra cualquiera de los responsables sin necesidad de fraccionar su reclamación, caracteres y requisitos que concurren en las obligaciones del artículo 1.903 del C.C., puesto que: 1.ª) hay pluralidad de sujetos pasivos, por estar obligados a reparar tanto el autor material del daño como la empresa de la que aquél es empleado o dependiente; 2.ª) unidad de objeto, cristalizado en reparar el daño causado; 3.ª) pluralidad de vínculos, pues la obligación de la empresa, fundada en la culpa "in eligendo" o "in vigilando", es distinta e independiente de la que contrae el autor material; y 4.ª) garantía del perjudicado, el que para conseguir la indemnización puede dirigirse indistintamente contra ambos responsables o contra cualquiera de ellos, puesto que cada uno de aquellos frente al perjudicado es deudor por entero de la obligación de reparar la totalidad del daño causado; y por todo ello hay que declarar que la responsabilidad definida en el artículo 1.903 es de naturaleza solidaria respecto a la que es originaria y propia del autor material del daño. Soto Nieto, *op. cit.*, pág. 196.

El Estado se encuentra entre las personas específicamente enumeradas en el Art. 1803 del Código Civil, *supra*, y tanto la letra expresa de este artículo como la jurisprudencia, disponen que el Estado será responsable "en las mismas circunstancias y condiciones en que sería responsable un ciudadano particular". Art. 1803 del Código Civil, *supra*. Tomando en consideración toda la doctrina y las normas previamente reseñadas, al amparo del Art. 1803, *supra*, no está prescrita la acción; la responsabilidad del Estado frente al reclamante damnificado sería una de carácter solidaria.

## V

*La interrupción del término prescriptivo y la solidaridad*

[L]a prescripción extintiva de las acciones tiene por principal fundamento la sanción o castigo al negligente en ejercitarlas, lo cual exige que esté evidenciado el propósito del abandono, que presupone la renuncia del derecho ....[13]

Para concluir nuestro análisis sobre el derecho sustantivo que rige la determinación de materialidad del hecho sobre si el codemandante Martínez Díaz desconocía, al presentar la demanda, el verdadero nombre del codemandado De Jesús Muriel, debemos analizar el principio de la interrupción de la prescripción en relación con la figura de la solidaridad.

La doctrina mayoritaria en el derecho español reconoce la vinculación solidaria de los corresponsables del ilícito culposo (Art. 1802 del Código Civil, 31 L.P.R.A. sec. 5141) y de las personas enumeradas en el Art. 1903 del Código Civil español con el causante material del daño (Art. 1803 nuestro, *supra*), frente al reclamante perjudicado.[14] H.M. Brau, *Los daños y perjuicios extracontractuales en Puerto Rico*, 2da ed. rev., San Juan, Pubs. J.T.S., 1986, Vol. II, Cap. X; H.M. Brau, *El término prescriptivo y su interrupción en acciones en daños por responsabilidad extracontractual solidaria en el Derecho puertorriqueño*, 44 Rev. C. Abo. P.R. 203, 236 (1986); Soto Nieto, *op. cit.*, págs. 72–76; J. Santos Briz, *Derecho de Daños*, Madrid, Ed. Rev. Der. Privado, 1963, págs. 291–292; J. Puig Brutau, *Fundamen-*

---

[13] Sentencia de 17 de diciembre de 1927 del Tribunal Supremo de España, según citado en *Silva Wiscovich v. Weber Dental Mfg. Co.*, 119 D.P.R. 550 (1987).

[14] Por no estar planteado, no es necesario que en este recurso discutamos la interacción de la Ley Núm. 104, *supra*, que proviene del *Federal Torts Claims Act*, con el Art. 1803 del Código Civil, 31 L.P.R.A. sec. 5142, de entronque netamente civilista, y su efecto sobre todas las consecuencias que generalmente se derivan de la solidaridad. Por ejemplo, qué efectos, si algunos, tienen estas disposiciones sobre el derecho a nivelación.

*tos de Derecho Civil*, 2da ed. rev., Barcelona, Ed. Bosch, 1976, T. I, Vol. 2, págs. 162–192; L. Díez-Picazo, *Fundamentos del Derecho Civil Patrimonial*, Madrid, Ed. Tecnos, 1970, Cap. XII; Borrell Macía, *op. cit.*, págs. 250–255.

La misma trayectoria hemos seguido en nuestras interpretaciones sobre la responsabilidad de aquellos unidos por vínculos de solidaridad. También hemos acogido la posición adoptada por la mayoría de los tratadistas y la jurisprudencia española, de que a la obligación solidaria dimanante de la responsabilidad extracontractual de coautores del mismo hecho dañoso, les son aplicables todas las consecuencias ínsitas a la dinámica y mecanismo de la responsabilidad solidaria. *García v. Gobierno de la Capital*, 72 D.P.R. 138 (1951); *Tropigas de P.R. v. Tribunal Superior*, 102 D.P.R. 630 (1974); *Rodríguez Sosa v. Cervecería India*, 106 D.P.R. 479 (1977); *Rivera Otero v. Casco Sales Co.*, 115 D.P.R. 662 (1984); Soto Nieto, *op. cit.*, págs. 59–76. Por lo tanto, la interposición de una reclamación judicial en tiempo contra uno de los codeudores solidarios tiene el efecto de interrumpir el término prescriptivo para todos los demás codeudores solidarios. Art. 1094 del Código Civil, 31 L.P.R.A. sec. 3105; *Rivera Otero v. Casco Sales Co.*, supra, pág. 667; *Tropigas de P.R. v. Tribunal Superior*, supra. Véase, también, *Arroyo v. Hospital La Concepción*, 130 D.P.R. 596 (1992).

En el caso de autos, las alegaciones de la demanda enmendada, a tenor con lo dispuesto en el Art. 1803 del Código Civil, *supra*, y las normas de derecho previamente esbozadas, correctamente exponían hechos suficientes para poder concluir que, de poderlos probar, el Estado sería, frente al reclamante, solidariamente responsable con el agente De Jesús Muriel por los daños reclamados. Si De Jesús Muriel fue correctamente incluido en la demanda original mediante el mecanismo procesal de nombre ficticio —John Doe Empleado— para designar demandados cuyos nombres verdaderos se desconocen, entonces el término

prescriptivo quedó interrumpido para el Estado y, por lo tanto, no procedía la sentencia sumaria para desestimar la demanda contra el Estado. Art. 1094 del Código Civil, *supra*.

## VI

*Declaraciones juradas conflictivas — Hechos en controversia y la sentencia sumaria*

En el presente caso hay que resolver si el conflicto creado entre la declaración jurada prestada por el codemandante Martínez Díaz y presentada en oposición a la moción de sentencia sumaria del Estado, y las presentadas en apoyo de dicha moción creó una genuina controversia real sobre el hecho material esencial de si el codemandante Martínez Díaz conocía o no el verdadero nombre del codemandado De Jesús Muriel, de forma tal que procediese a denegar o acoger la solicitud de sentencia sumaria.

Al determinar si una declaración jurada conflictiva presentada en oposición a una moción de sentencia sumaria efectivamente crea una controversia genuina real y no una ficticia e inexistente, el tribunal podrá tomar en consideración factores tales como: (1) si la declaración resulta ser clara e inherentemente incompatible con la previamente prestada; (2) si la declaración aclara ambigüedades o explica aspectos de la anterior; (3) las razones expuestas para explicar los conflictos; (4) si la declaración previa denota un estado de confusión de parte del declarante o refleja que lo aseverado no era creíble o que se cometió un error, y (5) si lo declarado en la contradeclaración resulta increíble. El tribunal, al hacer esta evaluación, también tomará en consideración los demás documentos que obren en el expediente. El eje central de la determinación sobre la existencia de una controversia genuina real sobre un hecho material esencial es el que verdaderamente sea ne-

cesaria una vista evidenciaria para resolver el conflicto; que con los documentos sometidos no baste.

## VII

*Aplicación de las normas de derecho a los hechos del caso*

En su escrito para mostrar causa la parte demandante expresa que como resultado del incidente que avala la demanda, el codemandante Martínez Díaz recibió un disparo que lo hirió en el abdomen y la columna vertebral, e hizo necesario que fuera tratado quirúrgicamente y posteriormente recibiera tratamiento ambulatorio por casi seis (6) meses. También arguye que de la declaración jurada de 14 de agosto de 1986, que utiliza el Estado para apoyar su contención de que el codemandante Martínez Díaz conocía el nombre del codemandado De Jesús Muriel al presentar la demanda el 13 de abril de 1987, sólo se desprende que el nombre de De Jesús Muriel surge de las preguntas que el investigador le hizo y que "es importante señalar que dicha declaración se preparó [en] momentos cercanos al trágico accidente, [por] lo cual era de esperarse que la capacidad emocional y de retención del recurrido estuviese [sic] menoscabada". De las demás declaraciones y documentos que obran en autos tampoco surge con claridad que Martínez Díaz conociese o recordase el nombre de su agresor ni que se le hubiese comunicado el memorando interno de la Policía sobre la investigación ni que le fuera enviada la supuesta carta en la que se le comunica la expulsión de la Policía de De Jesús Muriel ni que tuvo conocimiento del contenido de la denuncia y acusación presentadas contra De Jesús Muriel.

Esta situación de hechos refleja que la declaración presentada por Martínez Díaz en oposición a la moción de sentencia sumaria no era inherentemente incompatible con las previamente prestadas, que en ella se intentó explicar

los conflictos y que lo declarado no resultaba ser increíble a la luz de todos los documentos que el tribunal de instancia tuvo ante sí. *Camfield Tires, Inc. v. Michelin Tire Corp.*, 719 F.2d 1361 (8vo Cir. 1983); *Van T. Junkins and Associates v. U.S. Industries*, 737 F.2d 656 (11mo Cir. 1984); *Miller v. A.H. Robins Co., Inc.*, 766 F.2d 1102 (7mo Cir. 1985); *Franks v. Nimmo*, 796 F.2d 1230 (10mo Cir. 1986). A tenor con estos hechos, se podría efectivamente concluir, como lo hizo el tribunal de instancia, que esta declaración creó una controversia genuina sobre un hecho material sustancial; por lo que no procedía que se dictase sentencia sumaria que desestimara la demanda contra el Estado por estar prescrita. Para dirimir el conflicto de hecho y disponer del asunto, el tribunal debió haber señalado una vista evidenciaria inmediata. Regla 1 de Procedimiento Civil, *supra*, y Regla 38 de Procedimiento Civil, 32 L.P.R.A. Ap. III.

Cabe señalar, además, que de los escritos sometidos por la parte demandante y los documentos que obran en autos surge que miembros de la uniformada, aparentemente, le habían informado a Martínez Díaz que el día de los hechos el codemandado De Jesús Muriel estaba trabajando para la Panadería Valoi como guardia de seguridad, y que no fue hasta el 9 de septiembre de 1987 que la parte demandante se enteró de que De Jesús Muriel no estaba trabajando como guardia de seguridad para la Panadería Valoi. Fue en ese momento, pasado ya el término prescriptivo, que el codemandante Martínez Díaz advino en conocimiento de que el Estado podría ser responsable por los daños causados por De Jesús Muriel.[15]

---

[15] Ante estas circunstancias, el Estado alega que los demandantes, como conocían que De Jesús Muriel era policía, debieron incluirlo en la demanda original como demandado y hacer alegaciones en la alternativa. No les asiste la razón. Si creyendo que De Jesús Muriel, al momento de ocurrir el incidente, era empleado de seguridad de la Panadería Valoi y que actuaba como tal, hubiesen incluido al Estado como demandado, ésta hubiese sido una actuación irresponsable de su parte, contraria a las Reglas 1 y 9 de Procedimiento Civil, 32 L.P.R.A. Ap. III, y al Canon 17 del Código de Ética Profesional, 4 L.P.R.A. Ap. IX.

Como puede observarse, en el caso de autos, no sólo no conocían los demandantes de la posible responsabilidad del Estado, sino que, de acuerdo con lo alegado por el codemandante Martínez Díaz, este desconocimiento se debió, precisamente, a las actuaciones de los funcionarios del Estado que lo indujeron a creer que el codemandado De Jesús Muriel era empleado de la Panadería Valoi y estaba desempeñándose como tal al momento de surgir el incidente que motivó la demanda. Esto, claro está, es un hecho que debe ser probado por la parte demandante en una vista evidenciaria.(16) De probarse, quedaría demostrado que esta conducta del Estado, ejecutada a través de sus agentes o representantes (funcionarios públicos), tuvo el efecto de inducir a los demandantes a creer que De Jesús Muriel actuó únicamente como empleado de la Panadería Valoi y no como agente de la Policía, y que no tenían una causa de acción para reclamarle daños al Estado. La representación que estos funcionarios le hicieron a Martínez Díaz tuvo, pues, el efecto de evitar que se presentara la reclamación contra el Estado en tiempo. Por lo tanto, aunque en la vista evidenciaria el Estado pudiese demostrar que el codemandante Martínez Díaz conocía el nombre de De Jesús Muriel al momento de presentar la demanda original, el Estado no podría beneficiarse de los efectos de la prescripción, estaría impedido de levantar esta defensa.

Al así decidir, se revalida nuestra convicción de que la buena fe es precepto general que permea toda conducta o actividad con trascendencia jurídica, y nos constriñe a proceder al nivel de sus postulados. *Berríos v. U.P.R.*, 116 D.P.R. 88 (1985); *Velilla v. Pueblo Supermarkets, Inc.*, 111 D.P.R. 585 (1981).

En lo referente a la aplicación del principio general de buena fe, Díez-Picazo nos ha dicho que: "[t]oda interpreta-

---

(16) Además de ser una alegación del codemandante Martínez Díaz, surge del memorando del capitán Ramos Robles con fecha de 22 de agosto de 1986.

ción de una norma, que conduzca a un resultado jurídico contrario a la buena fe, debe ser rechazada o, por lo menos, considerada como excepcional, por ser 'contra tenorem rationis' de la organización general. ... Como principio general del Derecho la norma que ordena que el comportamiento sea de buena fe, tiene el carácter de una norma supletoria y los Tribunales deben, a falta de otra norma especial, aplicar este principio para resolver el litigio planteado. ... [S]obre esta idea cardinal —sanción de toda conducta contraria a la buena fe—, deben los Tribunales inspirar sus decisiones". (Escolio omitido.) L. Díez-Picazo Ponce de León, *La Doctrina de los propios actos*, Barcelona, Ed. Bosch, 1963, Cap. V, págs. 139–140.

En consecuencia, opinamos que, de poder probar los demandantes sus alegaciones, en lo concerniente a la aplicación de los términos prescriptivos en este caso, "tanto la doctrina de los propios actos ... así como el principio general de *bona fides*, impiden que [el Estado] invoque con éxito la defensa de prescripción". *Velilla v. Pueblo Supermarkets, Inc.*, supra, pág. 588.

Por todo lo antes expuesto, contrario a lo expresado por la mayoría de este Tribunal, somos de la opinión que se deben confirmar las resoluciones dictadas por el Tribunal Superior, Sala de San Juan, de 26 de octubre y 30 de noviembre de 1988, denegando la moción de sentencia sumaria, y devolver el caso al tribunal de instancia para que continúen los procedimientos.